UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JOSEPH HIGGINBOTTOM and JODI HIGGINBOTTOM, individually as heirs; and JOSEPH HIGGINBOTTOM, as Personal Representative of the ESTATE OF ANTHONY HIGGINBOTTOM,

Plaintiffs,

v.

DEXCOM, INC.,

Defendant.

Case No.: 24-cv-0195-WQH-BLM

**ORDER**

HAYES, Judge:

The matter before the Court is the Motion to Dismiss SAC filed by Defendant Dexcom, Inc. (ECF No. 66.)

## I. PROCEDURAL HISTORY

On January 26, 2024, Plaintiff Joseph Higginbottom initiated this action by filing a Complaint in the Superior Court of California for the County of San Diego, Case No. 37-2024-00003700-CU-PL-CTL. (ECF No. 1-2.)

On January 30, 2024, Defendant Tandem Diabetes Care, Inc. ("Tandem") removed the action to this Court. (ECF No. 1.)

On February 20, 2024, Tandem filed a Motion to Dismiss Complaint. (ECF No. 5.) On the same day, Tandem filed an Answer. (ECF No. 7.)

On February 29, 2024, Plaintiff Joseph Higginbottom filed a Motion to Remand. (ECF No. 10.)

On March 4, 2024, Plaintiff Joseph Higginbottom filed a First Amended Complaint ("FAC"). (ECF No. 11.) The FAC asserted claims against Defendants Tandem; Dexcom, Inc. ("Dexcom"); and Does 1–50, inclusive. *Id.* at 1–2. On March 11, 2024, the Court denied Tandem's Motion to Dismiss Complaint (ECF No. 5) because the FAC became the operative pleading. (ECF No. 12.)

On March 18, 2024, Tandem filed a Motion to Dismiss FAC. (ECF No. 15.) On the same day, Dexcom filed a Motion to Dismiss FAC. (ECF No. 16.)

On August 13, 2024, the Court issued an Order denying the Motion to Remand (ECF No. 10) and granting the Motions to Dismiss FAC (ECF No. 15, 16). (ECF No. 35.)

On September 3, 2024, Plaintiff Joseph Higginbottom filed a Second Amended Complaint ("SAC"), which is the operative pleading. (ECF No. 38.) On September 11, 2024, Plaintiff Joseph Higginbottom filed a Motion to Add Jodi Higginbottom as a Party Plaintiff. (ECF No. 39.)

On September 17, 2024, Tandem filed a Motion to Dismiss SAC. (ECF No. 41.) On the same day, Dexcom filed a Motion to Dismiss SAC. (ECF No. 42.)

On November 5, 2024, the Court denied Tandem's Motion to Dismiss SAC because Tandem agreed to "cancel" its submission. (ECF Nos. 46, 47.) On January 17, 2025, the parties filed a Joint Motion for Stay reporting that Plaintiff Joseph Higginbottom and Tandem reached a settlement. (ECF No. 50.)

On January 21, 2025, the Court issued an Order staying this action. (ECF No. 51.) During the period from March 12, 2025 to September 5, 2025 the Court granted multiple extensions of the stay. (ECF Nos. 54, 57, 59, 62.)[1]

On September 29, 2025, Plaintiff Joseph Higginbottom and Dexcom filed a Joint Status Report indicating that their mediation was unsuccessful and that Dexcom intended to refile its Motion to Dismiss SAC. (ECF No. 63 at 2.) On the same day, the Court lifted the stay of this action. (ECF No. 64.)

On October 20, 2025, Dexcom filed the pending Motion to Dismiss SAC. (ECF No. 66.)

On October 23, 2025, the parties filed a Joint Motion to Dismiss Defendant Tandem. (ECF No. 67.) On October 28, 2025, the Court issued an Order granting the motion and dismissed this action as to Tandem with prejudice. (ECF No. 69.)

On November 24, 2025, Plaintiff Joseph Higginbottom filed an Opposition to the Motion to Dismiss SAC. (ECF No. 72.) On the same day, Plaintiff Joseph Higginbottom filed a renewed Motion to Add Jodi Higginbottom as a Party Plaintiff. (ECF No. 73.)

On December 9, 2025, Dexcom filed a Reply in Support of the Motion to Dismiss SAC. (ECF No. 74.)

On January 5, 2026, the Court issued an Order joining Jodi Higginbottom as a Plaintiff in this action. (ECF No. 75.)

On July 31, 2026, Dexcom filed a Notice of Supplemental Authority. (ECF No. 77.)

## II. ALLEGATIONS IN THE SAC

Plaintiffs Joseph and Jodi Higginbottom (together, "Plaintiffs") bring this action individually and on behalf of the Estate of Anthony Higginbottom ("Anthony" or "the Decedent"), a minor decedent to whom Plaintiffs are successors-in-interest. (SAC ¶ 2.)

/ / /

---

[1] In its August 4, 2025 Order, the Court also denied without prejudice Dexcom's Motion to Dismiss SAC (ECF No. 42). (ECF No. 59 at 3.)

### A. Dexcom's G6 System

Dexcom is a Delaware corporation with its principal place of business in San Diego, California that manufactures and distributes the Dexcom G6 Integrated Continuous Glucose Monitoring System (the "G6 System"). *Id.* ¶¶ 3–5. The G6 System is a prescribed medical device for use by diabetic patients that scans, detects, and provides alerts for dangerous glucose levels. *Id.* ¶¶ 24, 67. The G6 System consists of three components: (1) a wearable patch sensor that continuously monitors a user's blood glucose value and (2) a transmitter that collects that data and transmits it via a Bluetooth connection to (3) a display device, which may be the user's smartphone or a separate proprietary receiver. *Id.* ¶¶ 25, 72. The G6 System is designed to "sound the alarm" when a near-dangerous blood glucose level is detected and provide a diabetic user with an "advance warning to avoid a potential hyperglycemic or hypoglycemic event." *Id.* ¶ 29.

Tandem is a Delaware corporation that manufactures and distributes the Tandem t:slim X2 Insulin Pump (the "t:slim pump"). *Id.* ¶¶ 6–8. The t:slim pump is a prescribed medical device that operates as an automated insulin delivery system for the management of diabetes. *Id.* ¶ 26. The t:slim pump "integrates" with the G6 system to create a diabetes therapy system for patients who require regular insulin doses, including corrective dosing based on detection of hyperglycemia and hypoglycemia. *Id.* ¶¶ 27–28.

The G6 System has a "propensity to obtain inaccurate glucose readings, fail to transmit glucose readings, and/or notify and alert its users of potential hyperglycemic and hypoglycemic events." *Id.* ¶ 30. When used in connected with the t:slim pump, the G6 System can increase the risk of "insulin stacking," which means "taking multiple doses of insulin at close intervals" and "caus[ing] a rapid drop in blood sugar levels." *Id.*

### B. FDA Classification of the G6 System

On March 27, 2018, the G6 System was granted clearance by the FDA as a Class II device via a De Novo classification request. *Id.* ¶ 43. During the period from October 2018 to July 2021, the FDA granted six different 510(k) clearances for the G6 System regarding

various features, such as an interface for a mobile application, modifications to the transmitter and its adhesive, and changes to storage and display features. *Id.* ¶¶ 46–51.

On February 18, 2022, the FDA issued a Final Rule describing special controls for all "integrated continuous glucose monitoring system[s]." *Id.* ¶ 44; *see* 21 C.F.R. § 862.1355. The Final Rule states that, "[a]fter review of the information submitted" in Dexcom's De Novo classification request, the agency determined that the G6 System could "be classified into class II with the establishment of special controls. FDA has determined that these special controls, in addition to the general controls, will provide reasonable assurance of the safety and effectiveness of the device." 87 Fed. Reg. 9237, 9237–38 (Feb. 18, 2022). The classification and special controls, as codified in the final regulation, state that the G6 System is "[a]n integrated continuous glucose monitoring system" classified as Class II with enumerated "special controls." 21 C.F.R. § 862.1355(a), (b).

**C. Anthony's Use of the G6 System**

On June 9, 2017, Dr. Brigitte Frohnert of the Barbara Davis Center for Diabetes ("BDCD") diagnosed Anthony with Type I Diabetes. *Id.* ¶ 130. On September 20, 2017, Anthony was prescribed a t:slim pump and Dexcom G5 Continuous Glucose Monitoring System. *Id.* ¶ 132. On November 17, 2017, Carolyn Banion, CPNP ("Nurse Banion"), discussed the use of the G5 Continuous Glucose Monitoring System and t:slim pump with Anthony and Plaintiffs. *Id.* ¶ 133.

On October 18, 2018, Plaintiffs filled a prescription order for the G6 System. *Id.* ¶ 134. Nurse Banion discussed the "risks and benefits" of the G6 System with Anthony and Plaintiffs. *Id.* ¶ 135. Nurse Banion did not, however, "provide an assessment of the risks associated [with the] G6 System, such as: signal loss, inaccurate [blood glucose values ("BGV")] readings, or missed/failed alerts because such information was . . . not provided to BDCD in its labeling, instructions for use, or physician training materials." *Id.*

Anthony used the G6 System "on a daily basis to monitor his BGV trends in real-time, to prevent hyperglycemic and hypoglycemic episodes, and in the overall management of [his] diabetes" in accordance with the user instructions provided by Dexcom. *Id.* ¶ 146.

Neither Plaintiffs nor Anthony made any changes or alterations to the G6 System or the t:slim pump, and Plaintiffs supervised Anthony's use of the devices in accordance with Dexcom and Tandem's direction. *Id.* ¶ 147–48.

On or about August 4, 2020, Anthony "changed out his G6 System sensor" with one that he had received and activated in the days prior. *Id.* ¶ 149–50. On August 5, 2020, at 2:00 a.m., the G6 System read Anthony's blood glucose level as 258. *Id.* ¶ 153. At 6:00 a.m., Anthony received a 1.319 *u* scheduled bolus (an insulin dose). *Id.* At 7:00 a.m., Anthony received another 1.375 *u* bolus, but the G6 System still read Anthony's blood glucose level as high at 219. *Id.* At 7:28 a.m., Anthony administered a corrective insulin 2.18 *u* bolus. *Id.* The G6 System still read Anthony's blood glucose level as 219. *Id.* At this time, the "BGV data from the G6 System was inaccurate" and Anthony "made a catastrophic mistake in stacking his insulin." *Id.* ¶ 154.

From 7:28 a.m. until approximately 8:43 a.m., the t:slim pump did not "suspend basal loads . . . and continued to supply basal loads of insulin infusions as provided for in [Anthony's] basal profile settings." *Id.* ¶ 155. The t:slim pump "suspended insulin delivery at approximately 8:43 a.m.," at which time Anthony's BGV was "reading 125." *Id.* ¶ 156.

At 8:43 a.m., Anthony was driving his car northbound on County Road 120 near Cheyenne, Wyoming on his way to pick up his girlfriend to go hiking. *Id.* ¶ 157. The "stacked insulin administered by the t:slim pump per the basal profile setting coupled with the additional corrective dose [that Anthony] administered based on an inaccurate BGV data supplied by [the] G6 System" caused Anthony to "drop into hypoglycemia, pass out behind the wheel, and crash into a Laramie County weed and pest truck servicing the shoulder of the road." *Id.* ¶ 158. Anthony died from injuries suffered in the collision. *Id.* ¶ 159.

**D. Failure to Report Adverse Events**

After FDA approval of the G6 System, Dexcom had a continuing responsibility to "maintain[] the labeling of [the G6 System] in light of the most current risk information obtained from the real-world clinical experience" with the device and to report any

information to the FDA suggesting that the device may have caused/contributed to a death or serious injury. *Id.* ¶¶ 83–84. Dexcom's obligations "under federal law" included, among other things, "report[ing] to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the" G6 System. *Id.* ¶ 84 (citing 21 C.F.R. §§ 814 *et seq.*). Dexcom also had an obligation "[u]nder state law, including California law," to "exercise reasonable care in adequately warning about the dangers" of the G6 System that were "known or knowable" at the time of distribution. *Id.* ¶ 87.

The FDA maintains a Manufacturer and User Facility Device Experience database ("MAUDE"), which contains medical device reports of "adverse events, malfunctions and other device problems." *Id.* ¶ 90. Upon receiving notice from a user of a problem with the G6 System, Dexcom was required to fill out FDA form 3500A to report the complaint. *Id.* ¶ 102.

In 2018, the 37,342 complaints about the G6 System comprised 3.64% of all MAUDE reports in the year. *Id.* ¶ 103a. In 2019, the 81,430 complaints about the G6 System comprised 6.15% of all MAUDE reports in the year. *Id.* ¶ 103b. In 2020, the 202,163 complaints about the G6 System comprised 12.93% of all MAUDE reports in the year. *Id.* ¶ 103c. In 2021, the 265,510 complaints about the G6 System comprised 12.67% of all MAUDE reports in the year. *Id.* ¶ 103d. In 2022, the 231,480 complaints about the G6 System comprised 7.85% of all MAUDE reports in the year. *Id.* ¶ 103e.

In 2018, 226 injuries associated with the G6 System were reported to MAUDE. *Id.* ¶ 111a. In 2020, 1,548 injuries associated with the G6 System were reported to MAUDE. *Id.* ¶ 111b.

**E. Causes of Action**

Plaintiffs bring four causes of action against Dexcom: (1) negligence, *id.* ¶¶ 174–214; (2) strict products liability for failure to warn, *id.* ¶¶ 215–259; (3) a claim for punitive damages, *id.* ¶¶ 260–263; and (4) a wrongful death claim, *id.* ¶¶ 264–274.

/ / /

## III. CONTENTIONS

As a preliminary matter, Dexcom contends that Wyoming law applies to Plaintiffs' state law claims. (ECF No. 66-1 at 9, 16–19.) Plaintiffs respond that: (1) Dexcom waived its argument regarding the applicability of Wyoming law because it failed to raise the argument in its prior motion to dismiss; (2) a choice-of-law determination is premature at this stage of the proceedings because the inquiry "necessarily require[s] th[e] Court to consider extrinsic evidence"; and (3) the parties entered into a contract with a choice-of-law provision requiring the application of California law, which Dexcom has enforced in other proceedings. (ECF No. 72-1 at 10–20.)

Dexcom contends that the Court should dismiss the SAC for failure to state a claim because Plaintiffs' claims are expressly preempted under the Medical Device Amendments ("MDA") to the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq*. (ECF No. 66-1 at 15–23.) Notwithstanding its contentions regarding the applicability of Wyoming law, Dexcom contends that the FDCA expressly preempts Plaintiffs' claims under both California and Wyoming law. *Id.* at 20–21. Plaintiffs respond that their claims are not expressly preempted because their "state law claims based on a device manufacturer's failing to report adverse events to the FDA" are "viable *parallel* claim[s]" that the Medical Device Amendments to the FDCA do not preempt. (ECF No. 72-1 at 27.)

Dexcom also contends that, under both Wyoming and California law, Plaintiffs' claims are inadequately pled and should be dismissed for failure to state a claim. (ECF No. 66-1 at 25–32.) Plaintiffs respond that the SAC adequately "addresses th[e] Court's earlier concerns" in its Order dismissing the FAC. (ECF No. 72-1 at 22–26.) Dexcom contends, separately, that the Court should dismiss the SAC under Federal Rule of Civil Procedure 12(b)(7) for failure to join Jodi Higginbottom as a party to this action, or require that she be joined, because she is the decedent's mother. (ECF No. 66-1 at 32–33.)

## IV. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In order to state

a claim for relief, a pleading "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) is "proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting Fed. R. Civ. P. 8(a)). While a pleading "does not require 'detailed factual allegations,'" Rule 8 nevertheless "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

/ / /

/ / /

/ / /

/ / /

/ / /

## V. DISCUSSION

### A. Choice of Law

The Court begins by considering whether California or Wyoming law applies to Plaintiffs' state law claims.[2] "A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001), *opinion amended on denial of reh'g,* 273 F.3d 1266 (9th Cir. 2001). The Supreme Court of California explains the state's choice of law rules:

> California has two different analyses for selecting which law should be applied in an action. When the parties have an agreement that another jurisdiction's law will govern their disputes, the appropriate analysis for the trial court to undertake is set forth in *Nedlloyd*, which addresses the enforceability of contractual choice-of-law provisions.
>
> Alternatively, when there is no advance agreement on applicable law, but the action involves the claims of residents from outside California, the trial court may analyze the governmental interests of the various jurisdictions involved to select the most appropriate law.

*Washington Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 914–15 (Cal. 2001) (citing *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459 (Cal. 1992)); *see also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 590 (9th Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022).

---

[2] Plaintiffs contend that it is premature for the Court to conduct a choice-of-law analysis at this stage of the proceedings. (ECF No. 72-1 at 14–18.) The Court disagrees. The parties have dedicated substantial portions of their briefing to the issue and have provided adequate information for the Court to conduct an analysis at this stage of the proceedings. *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 558–59 (9th Cir. 2020) (holding that a district court had not erred by conducting a choice-of-law analysis at the motion to dismiss stage because "choice of law was one of the primary issues presented to the district court in the motion to dismiss," was "fully briefed," and the "district court was able to engage in a complete analysis"). Plaintiffs' citation to *Czuchaj v. Conair Corp.*, in which the district court found there was "insufficient briefing" on the choice-of-law issue, does not compel the opposite conclusion. No. 13-CV-1901-BEN RBB, 2014 WL 1664235, at *9 (S.D. Cal. Apr. 18, 2014).

*1. Waiver*

Plaintiffs contend that the Court should decline to consider "Dexcom's newfound argument" regarding the applicability of Wyoming law to their state law claims because the "law-of-the-case doctrine" requires that the Court leave undisturbed its earlier finding that "Plaintiff and Dexcom agree that California law applies." (ECF No. 72-1 at 11–13 (citing ECF No. 35 at 37 (emphasis omitted)).) Dexcom responds that the SAC contains "new and different allegations and claims" than the FAC, and that Dexcom "did not previously argue for application of Wyoming law because plaintiff's claims [in the FAC] were expressly preempted under either Wyoming or California law." (ECF No. 74 at 9–10 (emphasis omitted).)[3]

In its August 13, 2024 Order dismissing the FAC, the Court stated that "Plaintiff and Dexcom agree that California law applies." (ECF No. 35 at 37 n.12 (citing FAC ¶ 96; ECF No. 16-1 at 21).) The Court did not conduct a choice-of-law analysis in that Order because the parties did not raise the issue. Nor did the Court issue a holding regarding which state law applies to Plaintiffs' claims against Dexcom. The "law of the case doctrine," which provides that "a court will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case," does not apply. *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013). Plaintiffs' citation to *Carreno v. 360 Painting, LLC*, in which the district court stated in a footnote that the defendant had "waived its right to claim Virginia law applies . . . in briefing on the prior motion to dismiss," does not persuade the Court to hold otherwise. *Carreno v. 360 Painting, LLC*, No. 19CV2239-LAB-BGS, 2021 WL 1087106, at *2 n.1 (S.D. Cal. Mar. 19, 2021). Here, Dexcom did not waive its contentions regarding the applicability of Wyoming law by declining to raise the choice-

[3] The FAC asserted five causes of action against Dexcom: negligence, strict products liability for design defect, strict products liability for manufacturing defect, strict products liability for failure to warn, and wrongful death. (ECF No. 11 ¶¶ 72–165.)

of-law issue when moving to dismiss Plaintiffs' similar, but distinct, claims in the FAC. The Court proceeds to review the parties' arguments regarding the applicability of California and Wyoming law.

2. *Choice-of-Law Provision*

Plaintiffs contend that "Dexcom has judicially admitted that it has a contract with [] Plaintiff Jodi Higginbottom that[,] according to Dexcom[,] requires Jodi to arbitrate her claims alleged against Dexcom." (ECF No. 72-1 at 7, 9, 15 (parentheses omitted).) Plaintiffs contend that this agreement contains a choice-of-law provision stating that California law applies to their claims. *Id.* at 15–16. Plaintiffs contend that the Court has previously taken "judicial notice of 44 cases that were currently pending against Dexcom" in California Superior Court in which "Dexcom has moved to compel arbitration based on a provision in the device's terms of service that expressly states that California law governs all disputes between the parties or sought demurrer in cases where the terms of service did not apply." *Id.* at 18.

Dexcom responds that Plaintiff Joseph Higginbottom seeks to enforce a "choice-of-law provision in a contract he did not agree to" and which "Dexcom is not seeking to enforce against him." (ECF No. 74 at 11.) Dexcom states that it "recognizes that [Plaintiff Jodi Higginbottom's] claims are subject to arbitration, but has not raised that issue because Ms. Higginbottom is not a party." *Id.* at 11 n.14.

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Here, the SAC does not allege the existence of an agreement between Jodi Higginbottom and Dexcom. Nor do Plaintiffs attach any agreement as an exhibit to the SAC. Dexcom's Reply does indicate that an agreement may exist between Jodi Higginbottom, who is now a party to this action, and Dexcom. (ECF No. 74 at 11 n.14 ("recogniz[ing] that Ms. Higginbottom's claims are subject to arbitration"). However, at this stage of the proceedings, Plaintiffs have not pled the existence of an agreement, including a choice-of-

law clause within that agreement, such that it may be properly considered by the Court.[4] Plaintiffs have filed, as an exhibit in support of their Opposition, a motion to compel arbitration purportedly filed by Dexcom in a separate proceeding in California Superior Court to which Plaintiffs are not parties. ECF No. 72-2. In that filing, Dexcom moves to compel arbitration based on a provision in the Terms of Use agreement to which the plaintiff in that action agreed when creating their digital Dexcom account. *Id.* at 11. Although "statements of fact contained in a brief *may* be considered admissions of the party in the discretion of the district court," Dexcom's representations about its Terms of Use agreement in a separate action against a different party are inadequate—especially in the absence of any related allegations by Plaintiffs in this action—to support the conclusion that Plaintiffs entered into a contract with Dexcom containing an applicable choice-of-law provision. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988).

Even drawing all reasonable inferences in favor of Plaintiffs, the Court finds that the SAC does not contain sufficient allegations to conclude that the parties have "an agreement that another jurisdiction's law will govern their disputes,"[5] and, therefore, the Court proceeds to consider "the governmental interests of the various jurisdictions involved" in this action "to select the most appropriate law." *Washington Mut. Bank, FA*, 24 Cal. 4th at 914–15; *see also A.B. ex rel. Turner v. Google LLC*, 737 F. Supp. 3d 869, 882 (N.D. Cal. 2024), *motion to certify appeal denied*, No. 5:23-CV-03101-PCP, 2024 WL 4933345 (N.D. Cal. Dec. 2, 2024) (holding that a choice-of-law argument based on Google's Terms of Service, which were "neither incorporated by reference in the complaint nor judicially noticeable" would not be considered at the motion to dismiss stage).

/ / /

---

[4] Plaintiffs, in their Opposition, refer to "the contract attached to Plaintiff's motion to add Jodi Higginbottom." (ECF No. 72-1 at 17.) However, neither of the earlier motions seeking to join Jodi Higginbottom to this action were filed with an attached contract. (ECF No. 39 (attaching only a Certificate of Death); ECF No. 73 (filed without an attachment).)

[5] As addressed at the conclusion of this Order, Plaintiffs will be given an opportunity to file a Third Amended Complaint to add any appropriate allegations.

*3. Governmental Interest Test*

The governmental interest analysis used by California courts to determine choice-of-law issues entails "three steps." *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989), *as amended on reh'g* (Apr. 28, 1989).

> First, the court must determine whether the proposed foreign rule of decision differs from the forum rule.
>
> If there is a difference in the possible rules of decision, the court must next examine each jurisdiction's interest in the application of its standard to determine whether a "true conflict" exists. If only one jurisdiction has a legitimate interest in the application of its rule of decision, there is a "false conflict" and the law of the interested jurisdiction is applied.
>
> If more than one state has a legitimate interest, the court must move to the third stage of the analysis, which focuses on the comparative impairment of the interested jurisdictions. At this stage, the court seeks to identify and apply the law of the state whose interest would be the more impaired if its law were not applied.

*Id.* (quotations and citations omitted).

i. Difference in California and Wyoming Law

With respect to the first prong of the governmental interest test, Dexcom contends that California recognizes "failure-to-warn claims based on failure to report adverse events" to the FDA but that Wyoming does not recognize the same. (ECF No. 66-1 at 17.) Plaintiffs do not respond to this contention. (ECF No. 72-1 at 18–20 (contending only that the choice-of-law provision in Dexcom's Terms of Use controls and that Dexcom "makes no arguments suggesting that Wyoming's decision not to recognize [] failure-to-warn claims based on a failure to report adverse events was a 'fundamental policy' choice . . .").

Plaintiffs' negligence and strict products liability claims are both premised on Dexcom's alleged failure to warn the FDA and users about the risks of using the G6 System for insulin management. (SAC ¶¶ 177, 184–86 (alleging, with respect to the negligence claim, that Dexcom "had a duty under [] state law" to "exercise reasonable care to provide adequate warning about the risks and dangers of the G6 System" and that Dexcom breached

its duty by "receiving and failing to warn of or accurately report the device-related issues associated with many of the approximately 808,925 complaints about the G6 System to the FDA or the public . . .); *id.* ¶ 216 (asserting the same basis for the strict products liability claim for "failure to warn").)

California recognizes that "a failure to give adequate warnings might subject a manufacturer or distributor to strict liability when it knew or should have known of the danger and the necessity of warnings to ensure safe use." *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 996 (Cal. 1991) (en banc) (emphasis omitted); *Mize v. Mentor Worldwide LLC*, 51 Cal. App. 5th 850, 862 (Cal. Ct. App. 2020) (recognizing "failure-to-warn claims [] based on [the defendant's] breach of its duty to report information about adverse events to the FDA"); *Coleman v. Medtronic, Inc.*, 223 Cal. App. 4th 413, 428 (Cal. Ct. App. 2014) ("[T]he duty to warn should not be so narrowly defined as to exclude a requirement to file adverse event reports with the FDA if that is the only available method to warn doctors and consumers.").

Wyoming recognizes that "strict liability in tort is a valid cause of action" and that "a plaintiff may show a 'defect' by establishing that the manufacturer failed to warn about dangers associated with the product." *Ogle v. Caterpillar Tractor Co.*, 716 P.2d 334, 341 (Wyo. 1986); *Rohde v. Smiths Med.*, 165 P.3d 433, 441 (Wyo. 2007). The Court is not aware, however, of any authority indicating that Wyoming recognizes a manufacturer's failure to report information about adverse events to the FDA as providing a basis for strict liability. *See In re Allergan Biocell Textured Breast Implant Prods. Liab. Litig.*, 537 F. Supp. 3d 679, 733 (D.N.J. 2021) (surveying reporting-based failure-to-warn claims across states and finding no "relevant legal authority" regarding Wyoming law). Plaintiffs do not provide any authority indicating that such claims are cognizable under Wyoming law. Plaintiffs refer to "Wyoming's decision *not* to recognize a failure-to-warn claim[] based on a failure to report adverse events," and do not contend that general tort principles in Wyoming should be read to support liability for a failure to report adverse events to the FDA. (ECF No. 72-1 at 19 (emphasis added).) In the absence of authority indicating that

Wyoming recognizes a failure-to-warn claim based on a manufacturer's failure to report information about adverse events to the FDA, the Court declines to recognize such a claim under Wyoming law at this stage of the proceedings. *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) ("In assessing how a state's highest court would resolve a state law question—absent controlling state authority—federal courts look to existing state law without predicting potential changes in that law."); *see Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1024 (9th Cir. 2008) (explaining that a federal court exercising diversity jurisdiction over state law claims is "not free to create new" elements or exceptions to the state's "painstakingly established" law); *Cline v. Sunoco, Inc. (R&M)*, 159 F.4th 1171, 1202 (10th Cir. 2025) ("Our 'proper function' in a diversity case 'is to ascertain what the state law is, not what it ought to be.'") (quoting *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941); *cf. Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975) (per curiam) ("A federal court in a diversity case is not free to engraft onto [conflict-of-laws rules] exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits.").

At this stage in the proceedings, the Court concludes that California tort law recognizes a duty to warn the FDA about adverse events for medical devices, whereas Wyoming law is silent on the issue. These differences are not "wholly immaterial" because Plaintiffs' failure to warn claim is premised on Dexcom's inadequate reporting to the FDA regarding the G6 System. *Mazza*, 666 F.3d at 591 (explaining that a difference in state laws was "not trivial" because it might "spell the difference between the success and failure of a claim"). Because the two state laws differ in material respect, the Court considers the remaining prongs of the governmental interest test.

ii. <u>State Interests</u>

Plaintiffs allege that they "are, and at all times relevant were residents and citizens of Wyoming." (SAC ¶ 2.) "Every state has an interest in having its law applied to its resident claimants." *Mazza*, 666 F.3d at 591–92 (quoting *Zinser*, 252 F.3d at 1187).

Plaintiffs also allege that Dexcom has its principal place of business in San Diego, California and "is engaged in substantial comings and business activities in California." (SAC ¶¶ 3–4.) "[E]ach state has an interest in setting the appropriate level of liability for companies conducting business within its territory." *Mazza*, 666 F.3d at 592 (citing *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 91 (Cal. 2010)). Dexcom contends that both states have an interest in seeing their law applied to this case, and Plaintiffs do not raise an argument to the contrary. (ECF No. 66-1 at 18.) The Court concludes that California and Wyoming both have an interest in having their law applied to this case.

iii. Impairment of State Interests

Having found that the relevant laws of California and Wyoming differ and that each state has an interest in having its law applied to this case, the Court continues to the third prong of the governmental interest test: the "comparative impairment" inquiry. *McCann*, 48 Cal.4th at 96. The California Supreme Court states that a reviewing court must "carefully evaluate and compare the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Id.* at 96–97 (citation and quotation omitted). "The test recognizes the importance of our most basic concepts of federalism, emphasizing the 'the appropriate scope of conflicting state policies,' not evaluating their underlying wisdom." *Mazza*, 666 F.3d at 593 (quoting *McCann*, 48 Cal. 4th at 97). The question is "which jurisdiction should be allocated the predominating lawmaking power under the circumstances of the present case." *McCann*, 48 Cal. 4th at 97.

Dexcom contends that "Wyoming's interest would be more impaired if California law applied" because Wyoming has an "overriding interest in seeing its law applied in cases involving alleged injuries to its residents that occurred in Wyoming." (ECF No. 66-1 at 18.) Dexcom contends that California's "interest in having its laws applied [] is minimal" because the "reach of California's product liability policy is confined to protection of California residents and persons injured in California." *Id.* at 19. Plaintiffs

respond that "Dexcom is headquartered in California and the [G6 System] was designed, tested, manufactured, labeled, promoted, surveilled, and regulated in California." (ECF No. 72-1 at 19.)

California law acknowledges that "a jurisdiction ordinarily has 'the predominant interest' in regulating conduct that occurs within its borders." *McCann*, 48 Cal. 4th at 97–98 (quoting *Reich v. Purcell*, 67 Cal. 2d 551, 556 (Cal. 1967) (en banc)). In a case concerning the application of consumer protection laws to a nationwide class of automobile purchasers, the Ninth Circuit recognized that California's interest in regulating the behavior of businesses within its borders is more "attenuated" when that law would apply to "residents of foreign states." *Mazza*, 666 F.3d at 594. The Ninth Circuit stated that, although "California has an interest in regulating those who do business within its state boundaries," the application of its laws "to the claims of foreign residents concerning acts that took place in other states" was not "necessary to achieve that interest in th[e] case." *Id.*; *cf. McGhee*, 871 F.2d at 1424 (declining to apply California law despite one of the defendant's shareholders, Chevron, having its headquarters in California and recruiting Californian employees because the plaintiff did not allege "that Chevron or [the defendant's] recruitment subsidiary played any direct role" in the alleged tortious conduct). In other words, the impairment of California's regulatory interests is weaker when, as here, claims are brought by residents of another state against a corporate defendant with its headquarters in California.

Plaintiffs allege that Dexcom has its principal place of business in California but that they are residents and citizens of Wyoming. (SAC ¶¶ 2–5.) Plaintiffs allege that the vehicular incident that caused Anthony's death also occurred in Wyoming. *Id.* ¶ 157. Plaintiffs do not identify the location in which Anthony used the G6 System in the period preceding the accident but, even drawing all reasonable inferences in favor of Plaintiffs, the SAC supports the conclusion that the conduct precipitating the vehicular incident also occurred in Wyoming. This case concerns claims brought by Wyoming residents arising from conduct that occurred primarily in Wyoming against a corporation headquartered in

California. Wyoming, therefore, properly claims the predominant interest in having its law applied to this dispute. Wyoming's interest in having its law applied to its own residents and to conduct within its borders would be more seriously impaired by the application of California law than California's interest in regulating companies based within its boundaries would be impaired by application of Wyoming law.

Other district courts conducting choice-of-law analyses for tort claims related to medical devices have reached similar conclusions regarding the applicability of out-of-state law to claims brought by foreign residents. *Avrin v. Mentor Worldwide LLC*, No. SACV 23-02278-CJC (ADSX), 2024 WL 1151672, at *5 (C.D. Cal. Mar. 15, 2024) ("Colorado's interest would be more impaired if its policy were subordinated to California's on this issue—this case concerns injuries [to] Plaintiffs, who are residents of Colorado, sustained in Colorado."); *Vieira v. Mentor Worldwide, LLC*, 392 F. Supp. 3d 1117, 1131 (C.D. Cal. 2019), *aff'd,* 845 F. App'x 503 (9th Cir. 2021).

Under the governmental interest test and based on the allegations in the SAC, Wyoming law applies to Plaintiffs' state law claims arising from Dexcom's alleged failure to report adverse incidents about its G6 System.

**B. Preemption**

Dexcom contends that Plaintiffs' claims are expressly preempted by the MDA to the FDCA because the FDA established specific requirements for the G6 System and state law requirements would impose different or additional requirements than those imposed by the federal government. (ECF No. 66-1 at 15–21.) Dexcom also contends, separately, that Plaintiffs' claims are impliedly preempted by the MDA. *Id.* at 23–25. Plaintiffs respond that, at the time that Anthony died, the G6 System was not subject to device-specific FDA regulations and, therefore, is not preempted by the MDA. (ECF No. 72-1 at 21–22, 26–28.) Plaintiffs also contend that their claims are not impliedly preempted because Dexcom "cannot meet its heavy burden of establishing [the] existence" of "impossibility preemption" for their claims. *Id.* at 28–30.

In 1976, Congress enacted the Medical Device Amendments, 21 U.S.C. § 360c *et seq*., to require FDA approval of medical devices. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 315 (2008). The MDA establishes "various levels of oversight for medical devices, depending on the risks they present." *Id.* at 316; 21 U.S.C. § 360c(a). Class I devices, including bandages and gloves, are subject to the lowest level of oversight. *Riegel*, 552 U.S. at 316 (citing 21 U.S.C. § 360c(a)(1)(A)). Class II devices, which include devices such as "powered wheelchairs and surgical drapes," are subject to "'special controls' such as performance standards and postmarket surveillance measures." *Id.* at 316–17 (citing 21 U.S.C. § 360c(a)(1)(B)). Class III devices, which are those devices used in "supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health" and include devices such as "replacement heart valves," are subject to the highest level of federal oversight. *Id.* at 317 (quoting 21 U.S.C. § 360c(a)(1)(C)(ii)).

By default, new medical devices are automatically categorized as Class III devices. 21 U.S.C. § 360c(f)(1). The FDA, however, may "take a variety of actions in appropriate circumstances to classify" a device into Class I or Class II. 87 Fed. Reg. at 9237. As relevant here, the FDA may classify a device "through 'De Novo' classification," and, "[a]lthough the device was automatically placed within [C]lass III, the De Novo classification is considered to be the initial classification of the device." *Id.* The FDA may also classify a new medical device under § 510(k), which "imposes a limited form of review" requiring a manufacturer only to "submit a 'premarket notification' to the FDA (the process is also known as a '§ 510(k) process,' after the number of the section in the original Act)." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 478 (1996). "If the FDA concludes on the basis of the § 510(k) notification that the device is "substantially equivalent" to a pre-existing device, it can be marketed without further regulatory analysis." *Id.*

Class II devices, for which "general controls by themselves are insufficient to provide reasonable assurance of the safety and effectiveness of the device," are subject to "special controls to provide such assurance, including the promulgation of performance

standards, postmarket surveillance, patient registries, development and dissemination of guidelines[,] recommendations, and other appropriate actions . . .." 21 U.SC. § 360c(a)(1)(B). "Once the FDA approves a device, the manufacturer is required to report any information that reasonably suggests that the device (1) '[m]ay have caused or contributed to a death or serious injury' or (2) '[h]as malfunctioned' and that any recurring malfunction 'would be likely to cause or contribute to a death or serious injury.'" *Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1226–27 (9th Cir. 2013) (quoting 21 C.F.R. § 803.50(a); 21 U.S.C. § 360i(a)); *Riegel*, 552 U.S. at 319.

The MDA includes an express preemption provision applicable to state or local regulation of all classes of medical devices:

> Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement –
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). The FDA interprets this statutory provision to mean that "[s]tate or local requirements are preempted only when the [FDA] has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the [FDCA], thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific [FDA] requirements." 21 C.F.R. § 808.1(d).

In *Riegel*, the Supreme Court established a two-prong framework to determine whether a state law claim is expressly preempted under the MDA. First, a court must "determine whether the Federal Government has established requirements applicable" to the medical device at issue. *Riegel*, 552 U.S. at 321. The Supreme Court explained that "federal manufacturing and labeling requirements applicable across the board to almost all

medical devices" will generally not preempt state law claims. *Id.* at 322 (citing *Lohr*, 518 U.S. at 501). Second, a court must consider whether a plaintiff's state law claims are based upon "requirements with respect to the device that are 'different from, or in addition to,' the federal ones, and that relate to safety and effectiveness." *Id.* at 321–22 (citing 21 U.S.C. § 360a(k)). The Supreme Court has explained that "common-law causes of action for negligence and strict liability *do* impose requirement[s]" that may be preempted by the MDA. *Id.* at 323–24 (emphasis added) (quotation omitted). If the FDA has established requirements applicable to a medical device and state law would impose different or additional obligations to the federal requirements, the MDA expressly preempts the state law claim.

The MDA may also impliedly preempt state law claims. In *Buckman Co. v. Plaintiffs' Legal Committee*, the Supreme Court held that the plaintiffs' fraud-on-the-FDA claims arising from alleged misstatements made to the agency during § 510(k) review for a bone screw device were impliedly preempted by the FDCA. 531 U.S. 341, 348 (2001). The Supreme Court reasoned that the "conflict" between state and federal law "stems from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives," and that this balance "can be skewed by allowing fraud-on-the-FDA claims under state tort law." *Id.* The Supreme Court noted that "flexibility is a critical component" of the FDCA's statutory scheme, and that "fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Id.* at 349–50.

The Supreme Court recognizes, however, that that the MDA "does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements." *Riegel*, 552 U.S. at 330; *Stengel*, 704 F.3d at 1228 ("The Supreme Court has decided three preemption cases under the MDA. The rule that emerges from these cases is that the MDA does not preempt a state-law claim for violating a state-law duty that

parallels a federal-law duty under the MDA."). In *Stengel*, the Ninth Circuit held that the plaintiffs' proposed state law claims, which asserted liability on the basis that the defendant manufacturer's "fail[ed] to warn the FDA" about the known risks of its medical device, was not preempted because the claim "rests on a state-law duty that parallels a federal-law duty under the MDA." 704 F.3d at 1233.

The result of these preemption doctrines is a "narrow gap" through which a state law claim may escape preemption under the MDA: "The plaintiff must be suing for conduct that violates the FDCA (or else his claim is expressly preempted by § 360k(a))"; however, "the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under *Buckman*)." *Perez v. Nidek Co.*, 711 F.3d 1109, 1120 (9th Cir. 2013) (quoting *In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1204 (8th Cir. 2010)).

The Court considers whether, based on the allegations in the SAC and drawing all reasonable inferences in favor of Plaintiffs, the MDA preempts Plaintiffs' state law claims against Dexcom.

*1. First Prong of the* Riegel *Test*

Dexcom contends that the Court has previously held that the FDA "imposed device-specific requirements on the G6 [System] to provide a reasonable assurance of safety and effectiveness." (ECF No. 66-1 at 16.) Plaintiffs respond that, at the time the "G6 System was cleared for sale in the United States, the FDA had not issued a Final Rule to establish requirements for the medical device De Novo classification process under the [FDCA], which was not published until February 18, 2022." (ECF No. 72-1 at 21 (citing SAC ¶ 43).) Plaintiffs contend that, at the time of Anthony's death on August 5, 2020, the G6 System were "regulated by 510(k) clearance," which does not qualify as a device-specific requirement. *Id.*

Under the first prong of the *Riegel* test, "state requirements are pre-empted 'only' when the FDA has established 'specific counterpart regulations or . . . other specific requirements applicable to a particular device.'" *Lohr*, 518 U.S. at 498 (quoting 21 CFR

§ 808.1(d)). In *Lohr*, the Supreme Court held that the plaintiff's state law claims against the manufacturer of a pacemaker were not preempted by the MDA because the FDA found that the device was "substantially equivalent to devices introduced into interstate commerce prior to the effective date of the [MDA]" pursuant to § 510(k) and permitted the manufacturer to "market its device subject only to the general control provisions of the [MDA]." 518 U.S. at 480. The Supreme Court reasoned that the FDA "may well examine § 510(k) applications" with regard to "the safety and effectiveness of the device," but that this substantial-equivalence review process was not "intended to do anything other than maintain the status quo with respect to the marketing of existing medical devices and their substantial equivalents." *Id.* at 493–94. In *Riegel*, conversely, the Supreme Court held that state law claims against a balloon catheter manufacturer were expressly preempted by the MDA because the Class III device had been subject to "premarket approval from the FDA." 552 U.S. at 320–21. The Supreme Court explained:

> Premarket approval [] imposes "requirements" under the MDA as we interpreted it in *Lohr*. Unlike general labeling duties, premarket approval is specific to individual devices. And it is in no sense an exemption from federal safety review—it *is* federal safety review.
>
> Thus, the attributes that *Lohr* found lacking in § 510(k) review are present here.

*Id.* at 322–23.

More recently, in *In re Bard IVC Filters Product Liability Litigation*, the Ninth Circuit considered whether the classification of intravascular filters as Class II devices—like the G6 System—that were subject to three special controls was adequate to establish specific requirements for the medical device and thereby satisfy the first *Riegel* prong. 969 F.3d 1067, 1074 (9th Cir. 2020). The Ninth Circuit held that that the "lack of specificity of the special controls" applicable to that medical device indicated a concern for only generalized health risks applicable to multiple categories of devices and did not contain "anything specific to intravascular filters, let alone to the particular intravascular filter at

issue here." *Id.* The Ninth Circuit rejected the defendant manufacturer's preemption argument. *Id.* at 1075.

Plaintiffs allege that, on March 27, 2018, the FDA approved a De Novo classification request submitted by Dexcom for the G6 System and classified the G6 System in Class II. (SAC ¶ 43.) The Final Rule later promulgated by the FDA explains that—at the time—the FDA "determined that the device can be classified into [C]lass II with the establishment of special controls" that "will provide reasonable assurance of the safety and effectiveness of the device." 87 Fed. Reg. at 9237–38. The Final Rule codifies those applicable special controls at 21 C.F.R. 862.1355(b). The special controls include, among other things, "design verification and validation" requirements based on "robust clinical data" to ensure accuracy and performance. 21 C.F.R. § 862.1355(b).

In its earlier Order dismissing Plaintiffs' FAC, the Court held that "the 'special controls' codified in 21 C.F.R. § 862.1355(b) are 'specific requirements applicable to a particular device.'" (ECF No. 35 at 38 (quoting 21 C.F.R. § 808.1(d)). The Court concluded that the FDA had "promulgated specific federal requirements for the G6 System such that the first prong of *Riegel* has been met." *Id.* at 36–37 (citing *Papike v. Tambrands Inc.*, 107 F.3d 737, 741–42 (9th Cir. 1997) (holding that the promulgation of "regulation mandating the specific substantive content of the [toxic shock syndrome] warnings on tampon boxes and/or tampon package inserts" was "device- and disease-specific and preemption is warranted").

In July 2024, the district court in *Dickson v. Dexcom, Inc.* reached the same conclusion regarding the G6 System in another case arising from a plaintiff's use of the device prior to an alleged motor vehicle accident on October 27, 2022, during which time the plaintiff's blood glucose levels "suddenly dropped to dangerously low levels" while pregnant. No. 2:24-CV-00121, 2024 WL 3417392, at *3 (W.D. La. July 15, 2024). The district court in *Dickson* held that that the "relevant requirements" for the G6 System had been published in the Federal Register, and that the first *Riegel* prong was satisfied because "the special controls established under 21 C.F.R. § 862.1355 are device-specific label and

design requirements of the FDA on which the [G6 System's] Class II de novo classification and approval depended." *Id.* at *6–7 (citing 87 Fed. Reg. at 9238; 21 C.F.R. § 862.1355); *see also Dickson v. Dexcom Inc.*, No. 2:24-CV-00121, 2024 WL 4291511 (W.D. La. Sept. 25, 2024) (granting a motion to dismiss the plaintiff's amended complaint).

Plaintiffs now urge the Court to reach an opposite conclusion than it did in its earlier Order because the SAC alleges that the Final Rule reflecting the special controls was not published before the vehicular accident that caused Anthony's death. (ECF No. 72-1 at 21; SAC ¶ 44.) Plaintiffs cite *Tuttle v. Dexcom, Inc.*, in which the district court concluded that the MDA did *not* preempt claims brought against Dexcom related to the death of the plaintiff's husband after suffering a hypoglycemic event in his sleep while using the G6 System. 1:20-CV-4744-LMM, 2021 WL 8998920, at *1 (N.D. Ga. May 20, 2021). In reviewing Dexcom's motion for judgment on the pleadings, the district court determined that it was unable to conclude whether the G6 System was "subject to FDA 'requirements' within the meaning of the preemption provision" of the MDA because "Dexcom's case for preemption turns on the nature of the De Novo classification process" and the regulations at issue had "not yet been codified." *Id.* at *6. The *Tuttle* court stated that it was required to "look beyond the four corners of the Complaint" to determine "whether the FDA imposed device-specific requirements" and concluded that it "lack[ed] the information necessary to conduct" the analysis at that stage of the proceedings. *Id.* In its earlier Order, this Court distinguished *Tuttle* because "the FDA had not yet classified the G6 System codified with special controls at the time that the *Tuttle* order was issued," whereas this Court was able to consider the Final Rule published by the FDA describing the special controls applicable to the G6 System. (ECF No. 35 at 36.)

The allegations in Plaintiff's SAC do not provide a basis for this Court to reach a different conclusion than it did in its previous Order. Plaintiffs allege that the G6 System gained clearance on March 27, 2018, which preceded the vehicular incident, and the cited regulation later promulgated by the FDA indicates that, at the time of classification, the G6 System was classified as a Class II device subject to special controls to provide a

"reasonable assurance of safety and effectiveness." (SAC ¶¶ 43–44; 87 Fed. Reg. at 9237.) Unlike general requirements, which may be imposed through substantial-equivalence review, the SAC supports the inference that the FDA classified the G6 System subject to device-specific, special controls for the purpose of assuring the safety of the medical device. The allegations that the G6 System underwent subsequent § 510(k) reviews for various aspects of its system—including new interfaces for elements, such as its mobile application and an adhesive patch—do not indicate that the special controls reflected in its initial classification no longer applied. (SAC ¶¶ 45–51.) The SAC supports the conclusion that, at the time of Anthony's use of the G6 System, the FDA had classified the device and applied special controls.

Accordingly, the Court concludes that the FDA issued specific federal requirements for the G6 System such that the first prong of the *Riegel* test is satisfied.

2. *Second Prong of the* Riegel *Test*

Dexcom contends that Plaintiffs' claims based on its alleged failure to warn the FDA about adverse events would impose requirements that are different than those imposed by the FDCA, which compels the conclusion that the MDA preempts those claims. (ECF No. 66-1 at 20–23.) Plaintiffs contend that their state law claims are "viable parallel claim[s] that satisf[y] *Riegel*'s second prong." (ECF No. 72-1 at 27.)[6]

Under the second prong of the *Riegel* test, a court must consider whether the plaintiffs' state law claims are based upon "requirements with respect to the device that are 'different from, or in addition to,' the federal ones, and that relate to safety and effectiveness." *Riegel*, 552 U.S. at 322 (quoting 21 U.S.C. § 360k(a)). The Ninth Circuit also states, however, that the Supreme Court's holdings in MDA-related cases establish

---

[6] In its earlier Order, the Court briefly reviewed the second *Riegel* prong but stated that Plaintiffs failed to respond to Dexcom's arguments. (ECF No. 35 at 37.) The Court also noted that "the FDA imposes five device-specific labeling requirements" on the G6 System. *Id.* (citing 21 C.F.R. § 862.1355(b)(7)). The Court held that, based on the FAC, Plaintiffs' claims against Dexcom were expressly preempted. *Id.* at 37–38.

that "the MDA does not preempt a state-law claim for violating a state-law duty that parallels a federal-law duty under the MDA." *Stengel*, 704 F.3d at 1228.

The *Stengel* court reviewed the plaintiffs' claims under Arizona negligence law based on the defendant manufacturer's "continuing duty to monitor the product after pre-market approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the product." *Id.* at 1232.

The Ninth Circuit stated:

> Arizona state law has long been concerned with the protection of consumers from harm caused by manufacturers' unreasonable behavior. Plaintiffs' claim is brought under settled Arizona law that protects the safety and health of Arizona citizens by imposing a general duty of reasonable care on product manufacturers. . . . Arizona tort law includes a cause of action for failure to warn.

*Id.* at 1233. The Ninth Circuit held that the plaintiffs' claims based on a failure-to-warn theory under Arizona negligence law were not preempted "insofar as the state-law duty parallels a federal-law duty under the MDA," and—without reaching the merits—determined that Arizona recognized a parallel state law duty. *Id.*; *see also Stengel v. Medtronic, Inc.*, No. CV 10-318-TUC-RCC, 2010 WL 4483970, at *1 (D. Ariz. Nov. 9, 2010), *aff'd,* 676 F.3d 1159 (9th Cir. 2012), *on reh'g en banc,* 704 F.3d 1224 (9th Cir. 2013), and *rev'd,* 704 F.3d 1224 (9th Cir. 2013) (explaining that the medical device at issue was a "SychroMed EL Pump and [] Catheter" classified as a Class III medical device).

After *Stengel*, a California Court of Appeal similarly concluded that "if a plaintiff's state law claims are based on requirements that parallel federal law, they are not expressly preempted." *Coleman v. Medtronic, Inc.*, 223 Cal. App. 4th 413, 425, *as modified* (Cal. Ct. App. Feb. 3, 2014), *dismissed, remanded and ordered published sub nom. Coleman v. Medtronic*, 331 P.3d 178 (Cal. Ct. App. 2014). The California appellate court held that the plaintiff's "failure to warn claim [under California law] based on [the defendant's] failure

to file adverse event reports with the FDA is not subject to express or implied preemption." *Id.* at 428.

The Ninth Circuit's guidance makes clear that Plaintiffs' claims in this action, to the extent that they seek liability under a state law duty that parallels a federal law duty under the MDA, are not preempted. The Court must therefore consider, like the *Stengel* court did, whether the applicable state law recognizes such a parallel claim. Having concluded, based upon the allegations in the SAC, that Wyoming law applies to Plaintiffs' claims, the determinative question at this stage is whether Wyoming recognizes a parallel state law duty for a failure to report adverse events, like the duties recognized under Arizona law in *Stengel* and under California law in *Coleman*. In its choice-of-law analysis, the Court concluded that there is inadequate authority to support the conclusion that Wyoming, like California, recognizes such a duty. Plaintiffs do not contend that, even in the absence of relevant authority, the Court should interpret general tort principles in Wyoming to support a negligence and strict products liability claim based on their failure-to-warn theory.

At this stage of the proceedings, the Court concludes that Wyoming law, unlike California and Arizona law, does not recognize a claim based on failure to report adverse events to the FDA. Plaintiffs, therefore, do not adequately plead a parallel cause of action such that their claims may avoid preemption under the MDA. *Cf. Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1280–81 (10th Cir. 2021) (affirming the district court's dismissal of similar claims under Kansas and Missouri law based on the preemption clause of the MDA). Based on this conclusion and in the absence of more specific contentions by Plaintiffs regarding the second prong of the *Riegel* test, the Court concludes that Plaintiffs' state law claims based on Dexcom's alleged failure to warn are expressly preempted by the MDA. Plaintiffs' negligence and strict products liability claims must be dismissed. At this stage, the Court declines to consider whether Plaintiffs' claims are also impliedly preempted by the MDA.

/ / /

/ / /

### C. Punitive Damages and Wrongful Death

A claim for punitive damages is "derivative of the substantive claims" in an action. *See Weaver v. Ethicon, Inc.*, No. 16CV257-GPC(BGS), 2017 WL 680725, at *9 (S.D. Cal. Feb. 21, 2017), *aff'd*, 737 F. App'x 315 (9th Cir. 2018) (dismissing punitive damages claim after determining that the plaintiffs' failure to warn claims were preempted by the MDA). A wrongful death claim must also be dismissed based on a plaintiff's failure to establish "wrongdoing on the part of the [d]efendants." *Patton v. Forest Lab'ys, Inc.*, No. EDCV17922MWFDTBX, 2018 WL 5269239, at *9 (C.D. Cal. Sept. 19, 2018), *aff'd,* 793 F. App'x 608 (9th Cir. 2020).

Having found that Plaintiffs' preceding claims for negligence and strict products liability must be dismissed, the Court must also dismiss Plaintiffs' derivative claims for punitive damages and wrongful death.

### D. Joinder

Defendant also moves to dismiss the SAC for Plaintiffs' "failure to join a party under Rule 19 or, alternatively, for an order compelling plaintiff to join decedent surviving mother, Jodi Higginbottom, as a party to this lawsuit." (ECF No. 66-1 at 32.) On January 5, 2026, the Court granted Plaintiff Joseph Higginbottom's Motion to Add Jodi Higginbottom as a Party Plaintiff (ECF No. 73) because she is a necessary party to this wrongful death action. (ECF No. 75 at 2.) Accordingly, the Motion to Dismiss SAC is rendered moot with respect to Dexcom's contentions regarding joinder of Plaintiff Jodi Higginbottom.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## VI. CONCLUSION

IT IS HEREBY ORDERED that the Motion to Dismiss (ECF No. 66) is granted. The SAC is dismissed without prejudice and with leave to amend.

IT IS FURTHER ORDERED that Plaintiffs may file an amended complaint, entitled "Third Amended Complaint," within thirty (30) days of the filing of this Order. If Plaintiffs do not file a Third Amended Complaint, the Court will direct the Clerk of Court to close this case.

DATED: 9/9/26

William Q. Hayes

**WILLIAM Q. HAYES**
United States District Judge